**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| MICHAELA M., by and through her next friend, KELLY M.; G.M., a minor child, by and through his next friend, KELLY M.; K.G., a minor child, by and through her next friend, KIMBERLY D.; J.H.C., a minor child, by and through his next friend, CRISTI C.; KATIE C., by and through her next friend, CINDY C.; CHESNEY F., by and through her next friend, KARI F.; JAMISON F., by and through his next friend, IRA F.; J.G., a minor child, by and through his next friend, GABRIELLE M.; ZAHARI W., by and through his next friend, COURTNEY W.; DONNY L., by and through his next friend, EVA L.; C.R., a minor child, by and through her next friend, SAMANTHA R.; C.C., a minor child, by and through his next friend, DENISE C.; M.C., a minor child, by and through his next friend, DENISE C.; H.G., a minor child, by and through her next friend, JACKLYN G.; O.E., a minor child, by and through his next friend, KATIE E.; D.L., a minor child, by and through her next friend, CATRINA L.; M.L., a minor child, by and through his next friend, CATRINA L.; A.L., a minor child, by and through her next friend, CATRINA L., individually and on behalf of all others similarly situated, | |
| | CASE NO. 2:24-cv-102 |
| | CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Plaintiffs, | |
| v. | |
| STEPHANIE M. AZAR, in her official capacity as Commissioner of the Alabama Medicaid Agency, | |
| JEAN W. BROWN, in her official capacity as Commissioner of the Alabama Department of Senior Services, | |
| Defendants. | |

## I.   NATURE OF THE ACTION

1.     The State of Alabama, through the Alabama Medicaid Agency (Alabama Medicaid) and the Alabama Department of Senior Services (ADSS), violates the constitutional and statutory rights of the approximately 12,000 individuals who have been found eligible to receive Home- and Community-Based Services (HCBS) through its Elderly and Disabled Medicaid Waiver program (E&D Waiver). Through consistent and unabated legal violations, the State creates such extreme barriers to access that obtaining the services to which recipients are entitled is nearly—or, in many cases, actually—impossible. The State's[1] failure to manage the E&D Waiver in accordance with federal law violates the Medicaid Act and the Fourteenth Amendment to the United States Constitution.

2.     The violations described throughout this Complaint do not represent the failures of single case managers or individual case management agencies to properly administer the waiver. Instead, they flow from the consistent failure of the State, at the highest levels, to ensure that the E&D Waiver is being administered in accordance with the law. The violations of E&D Waiver beneficiaries' rights are therefore systemwide, affecting urban and rural waiver recipients across Alabama.

3.     Plaintiffs bring this class action, on behalf of themselves and a class of similarly situated individuals, to challenge Alabama Medicaid and ADSS's violation of their rights under the Medicaid Act and the Fourteenth Amendment to the United States Constitution. Plaintiffs and the putative class seek injunctive relief compelling Defendants to remediate their consistent,

---

[1] As explained below, although ADSS is the entity responsible for the day-to-day administration of the E&D Waiver program, Alabama Medicaid is the Single State Agency bearing ultimate responsibility for the waiver program's compliance with federal law. Where individual actions are directly attributable to *either* ADSS *or* Alabama Medicaid, that will be indicated.

systemic failure to provide Plaintiffs with the community-based, long-term care services to which they are entitled, in violation of the Medicaid Act. Plaintiffs and the putative class further seek injunctive relief compelling Defendants to remediate their consistent, systemic failure to provide Plaintiffs with the due process protections required by the Medicaid Act and by the Fourteenth Amendment to the United States Constitution.

## II.   JURISDICTION AND VENUE

4.      This civil action for declaratory and injunctive relief is authorized by 42 U.S.C. § 1983 to redress the ongoing deprivation under color of state law of rights guaranteed under federal law. This Court has jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 & 1342(3) and 42 U.S.C. § 1983. Plaintiffs' request for declaratory and injunctive relief is proper under 28 U.S.C. § 2201-01.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), as Defendants presently reside in Alabama's Middle District.

## III.   PARTIES

### A.   Michaela M.

6.      Plaintiff Michaela M. is a 26-year-old woman living in Union Grove, Morgan County, Alabama. She is the sister of Plaintiff G.M. Her waiver services are administered by the North Alabama Regional Council of Governments (NARCOG). Michaela has been on the E&D Waiver since 2006. As an E&D Waiver recipient, Michaela has a property interest in the services available to her under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. Michaela brings this action through her mother and legal guardian, Kelly M.

7.     As a child, Michaela had intractable seizures which resulted in an intellectual disability. Michaela also has a genetic condition which has resulted in intestinal failure, chronic lung disease, and chronic bladder dysfunction. Because of this, she has several ostomies that drain her stomach and control her GI and bladder output. All of her nutrition is via total parenteral nutrition (TPN) through an indwelling IV tube into a major vein. Michaela also uses a BiPAP machine to help her breathe properly, since muscle weakness makes it difficult for her to do so while asleep.

8.     For years, Michaela's mother, Kelly, has sought services which are adequate to meet Michaela's extensive needs. After 10 years of repeated requests for Skilled Respite, Kelly was ultimately told that Michaela cannot access Skilled Respite while also utilizing Personal Choices for her Personal Care. When Kelly asked for a justification, she was told by an ADSS Assistant Commissioner that the distinction was "difficult to explain," but that "probably the easiest way is that you can't give yourself respite."[2] The Assistant Commissioner further confusingly advised Kelly that, "if [Michaela] meet[s] the criteria for any of the other services not covered under Personal Choices, then they are available for [Michaela]."

9.     After many years of attempting to obtain services that would adequately meet Michaela's needs, a "nursing assessment" finally took place on January 12, 2023. Although Michaela had been on the E&D Waiver for over 16 years at this point, this was the first true assessment of her needs that had ever taken place. The ADSS nurse assessor commented at Michaela's assessment meeting that ADSS had only recently implemented any kind of assessment "process" to address requests for new or increased services. However, there was (and continues to

---

[2] This is not what Kelly was requesting, which she clarified in a follow-up email. The Skilled Respite service cannot be self-directed, but that does not make it unavailable to waiver recipients who self-direct other services through the Personal Choices program.

be) no formalized, objective rubric, guidelines, criteria, or other assessment tool for determining an individual's service needs. ADSS and its representatives have maintained that the "assessment" process is based primarily on "observation" and a review of whatever medical records ADSS obtains in response to a request for services. In response to multiple requests for more information on any parameters or other guidelines for the assessment process, ADSS and its representatives have consistently provided no information beyond the nurse assessor's qualifications.

10.     Michaela's "nurse assessment" lasted roughly an hour. The nurse assessor had very few questions for Kelly, and her single interaction with Michaela was to tell Michaela "hello" as the nurse assessor was leaving the family's home at the end of the "assessment."

11.     Nearly a month later, on February 3, 2023, Michaela was "awarded" 25 hours per week of Skilled Nursing, 16 hours per week of Skilled Respite, and 64 hours per week of Personal Care. This award was significantly less than Michaela and her family's request for roughly 88 hours per week of skilled care (which could be fulfilled by either the Skilled Nursing or Skilled Respite service), and 80 hours of Personal Care. Although Michaela was granted less than the services requested, she was not provided with a formal denial notice that appropriately outlined her appeal and other due process rights until over a month later, on March 14, 2023.

12.     Despite an "award" of services from the state, Michaela's skilled services are still not in place, nor has Defendant ADSS fulfilled other statutory services in her care plan such as Adult Day Health. ADSS and NARCOG claim that "there are no providers" for these services in the family's region.

**B. G.M.**

13.     Plaintiff G.M. is a 17-year-old boy living in Union Grove, Morgan County, Alabama. His waiver services are administered by NARCOG. He is the brother of plaintiff

Michaela M. G.M. has been on the E&D Waiver since 2013. As an E&D Waiver recipient, G.M. has a property interest in the services available to him under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. G.M. brings this action through his mother, Kelly M.

14.     G.M. has multiple diagnoses, including severe Eosinophilic Esophagitis requiring a feeding tube; Ehlers-Danlos Syndrome, causing low muscle tone, global pain, and chronic fatigue; Mast Cell Activation Disorder; dysautonomia which causes migraines, weakness, and fluctuating vital signs; and is also suspected to have the same underlying genetic mitochondrial disease as his sister, Michaela. A learning disability has also been noted through testing. G.M. uses a wheelchair for school, long distances, or when feeling fatigued or ill.

15.     On March 31, 2023, Kelly submitted a proposed care plan on G.M.'s behalf, wherein she requested a total of 126 Personal Care hours per week and 22 Homemaker hours.[3] On May 2, 2023, G.M. tried to drive himself to several classes and other appointments alone. Kelly was at home with Michaela, who still did not (and does not) have nursing coverage, and G.M.'s father, Chris, who generally is only able to work as G.M.'s Personal Care provider outside of business hours, was working outside of the home. By the end of the day, G.M. was so physically ill and fatigued that he had to pull over to sleep in a parking lot; his brother, Asher, had to run food and medication out to G.M., who, by that time, simply was not well enough to drive home. On May 4, 2023, Kelly, out of desperation, asked for 40 additional Personal Care hours per week on

---

[3] Kelly also mentioned in the care plan that G.M. needs eight (8) hours per week of Skilled Nursing. However, since G.M. is under 21, Private Duty Nursing would be provided under Alabama's EPSDT program. That request is therefore not at issue here.

G.M.'s behalf (for a total of 80), to meet some of his needs while the original request from March was still pending.

16.     On June 16, 2023, G.M. was "awarded" 56 total hours per week of Personal Care and 18 hours per week of Unskilled Respite, well below the hours that Kelly requested on his behalf. While G.M., unlike most waiver recipients, did receive a "Notice of Action" that appropriately outlined his due process rights, no indication was given of how the ultimate determination was made—rendering the notice *still* legally insufficient. G.M. did not even receive a "nurse assessment," despite Defendant ADSS's numerous claims that the agency is trying to implement a more formalized and consistent process for evaluating service requests.

### C. K.G.

17.     Plaintiff K.G. is a 15-year-old girl living in Gardendale, Jefferson County, Alabama. Her waiver services are administered by the Regional Planning Commission of Greater Birmingham (RPCGB). K.G. has been on the E&D Waiver since about 2016. As an E&D Waiver recipient, K.G. has a property interest in the services available to her under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. K.G. brings this action through her mother, Kimberly D.

18.     K.G. has diagnoses of acute flaccid myelitis, chronic respiratory failure (resulting in her being dependent on a ventilator), quadriplegia, dysphagia, hypertension, gaseous abdominal distention, idiopathic constipation, dysmotility, osteoporosis, generalized anxiety disorder with panic attacks, bilateral dry eye syndrome, Postural Tachycardia Syndrome (POTS), recurrent vertigo, and autonomic dysfunction. She also has a history of enterovirus and kidney stones. Because K.G. is quadriplegic, she relies on her parents, Kim and Todd, for every aspect of her

care. This includes, but is not limited to, all activities of daily living (ADLs), medication administration, and ventilator care such as airway suctioning, a procedure involving the insertion of a suction catheter into the airway to clear any secretions that may have collected in the respiratory tract—secretions which, ordinarily, an individual would be able to clear from their own airway with a simple cough.

19.     K.G.'s family self-directs K.G.'s Personal Care services. Originally, K.G.'s family was under the impression that K.G. was approved for 40 hours per week of Personal Care, which her mother, Kim, provided. K.G. and her family could greatly benefit from more hours. K.G. weighs 137 pounds, and her mother is suffering severe health effects from being K.G.'s primary caregiver, including injuries to her back and shoulder, such as a torn rotator cuff. Kim is also battling her third melanoma diagnosis. On February 20, 2023, K.G.'s family made a request to add 40 more hours of Personal Care to K.G.'s care plan. At ADSS's request, Kim submitted a detailed schedule of the care tasks she performs for K.G. every day, many of which fell within the waiver definitions of the Personal Care service and the Homemaker service.[4]

20.     Over four months later, on June 23, 2023, K.G.'s "nurse assessment" finally took place. The ADSS nurse assessor met with Kim for over three hours, but only spent a few minutes talking to K.G. herself. Again, the nurse assessor openly told Kim that ADSS does not have a formalized process for evaluating service requests, but that the agency is "hoping to be able to create one." K.G.'s parents inquired several times over the following several months about the

---

[4] *See* Ala. Admin. Code § 560-X-36-.04(3): "Personal Care Services . . . include assistance with bathing, dressing, ambulation, eating, reminding client to take medications, and securing health care from appropriate sources"; *id*. at (2): "Homemaker Services are general household activities that include meal preparation, food shopping, bill paying, routine cleaning, and personal services."

status of their request, but the consistent answer from K.G.'s case manager was that ADSS was "meeting" to discuss the request.

21.    On July 28, 2023, K.G.'s parents were provided with a copy of K.G.'s monthly Spending Plan for the first time ever. The Spending Plan is the document that shows recipients who are self-directing their services the amount of services for which they have been approved, and what their monthly budget is to pay workers based on the approved service hours and the reimbursement rates for same. At that time, K.G.'s parents found out for the first time that K.G. was not actually approved for 40 hours per week of Personal Care. Instead, she was approved for 28 hours per week of Personal Care, and 12 hours per week of Homemaker—which has a lower hourly reimbursement rate. When Kim questioned this, she received an incomprehensible response from RPCGB's "Senior Personal Choices Counselor": "The care plan is determined by the case manager. The case manage [*sic*] assessed [*sic*] each member and comes up with a plan of care. But the care plan is showing a total of 40 hours."

22.    Finally, on October 27, 2023, after more than three months of waiting, K.G.'s family received a response to their request, adding only seven hours of Skilled Respite to K.G.'s care plan to "assist with performing skilled activities and provide respite for [*sic*] family."[5] K.G.'s Personal Care and Homemaker hours were not increased, "[b]ased on the itemized list reflecting that the activities being performed are skilled care, those activities cannot be supported through the Personal Care service hours." The award of hours also "encouraged" K.G.'s family to "take advantage" of the 70 hours per week of Private Duty Nursing (PDN) that ADSS contended K.G.

_____

[5] Because of a lack of providers, E&D Waiver recipients are unable to access Skilled Respite services, making an award of same essentially meaningless.

is authorized to receive through Alabama's EPSDT benefit, even though, due to a lack of providers, K.G. has never had consistent PDN.[6]

23.    K.G.'s family has appealed the determination, but ADSS has ignored their repeated requests for any documents relating to K.G.'s nurse assessment.[7] ADSS is preventing K.G. and her family from exercising K.G.'s due process right to lodge a meaningful challenge to the service award. Because ADSS is refusing to provide the documents to which K.G. and her family are entitled, it is impossible for them to know how ADSS determined the quantity of services to award and therefore impossible to effectively challenge it.

**D. J.H.C.**

24.    Plaintiff J.H.C. is a 12-year-old boy living in Millbrook, Elmore County, Alabama. His waiver services are administered by the Central Alabama Aging Consortium (CAAC). J.H.C. has been on the E&D Waiver since 2013. As an E&D Waiver recipient, J.H.C. has a property interest in the services available to him under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. J.H.C. brings this action through his mother, Cristi C.

25.    J.H.C. has Tetrasomy 18p, a rare genetic disorder affecting the 18th chromosome. Individuals with Tetrasomy 18p have 47 chromosomes instead of 46. The extra chromosome is

---

[6] K.G. has also never been approved for 70 hours a week of PDN; at the time ADSS handed down this decision, she was approved to receive 56 hours.

[7] K.G. and her family are entitled to this information under both HIPAA regulations and Medicaid regulations. *See* 42 C.F.R. 164.502(g)(3)(i) (entitlement of parents as health representatives of minor children to obtain medical records); 42 C.F.R. 431.242(a) (mandating that the beneficiary or their representative must be given an opportunity to review their entire case file and all documents to be used by the agency at a Fair Hearing). Additionally, the imports of due process and fundamental fairness would dictate that K.G. must be provided with this information to be able to mount a meaningful challenge.

called an "isochromosome," and is made up of two additional copies of the short arm of the chromosome 18. Therefore, there are a total of four copies of the "short arm" of chromosome 18. As a result, J.H.C. has a wide variety of health concerns and symptoms, including cyclic vomiting syndrome and other severe gastrointestinal issues, osteoporosis, mobility and gait issues, global developmental delays, autism, and specific antibody deficiency affecting his immune system. J.H.C. was also diagnosed with epilepsy at the age of three. After years of failed attempts at pharmaceutical treatment, J.H.C. received an updated diagnosis of intractable epilepsy; he then had a vagus nerve stimulator (VNS) implanted. Although the VNS has been effective in reducing the frequency and intensity of J.H.C.'s seizures, he still has anywhere from 40-50 seizures a day.

26.     Because of J.H.C.'s medical needs, he regularly sees more than 10 doctors, including both of his regular pediatricians, and multiple specialists. All of the specialists are located in Birmingham, Alabama, over an hour away from the family's home in Millbrook. Additionally, anytime J.H.C. experiences an exacerbation of any of his symptoms (e.g., his cyclic vomiting becomes more extreme), his family must take him to Children's of Alabama, where his specialists are located.

27.     J.H.C. received three hours per week of Personal Care from 2015 to 2017, when ADSS, through CAAC, unexpectedly and without explanation, changed him over to Unskilled Respite. Between 2015 and 2022, J.H.C. received 5 hours per week of Unskilled Respite. In late 2022, J.H.C.'s mother, Cristi, began working to switch J.H.C. over to the E&D Waiver's Personal Choices program, which would allow J.H.C.'s services to be self-directed. J.H.C.'s case manager and her supervisor both told Cristi that J.H.C. could not continue receiving Unskilled Respite under

the Personal Choices program, and that he would instead be switched to Personal Care and Homemaker.[8] No further information was provided on the delineation of services.

28.     In November 2022, during initial enrollment in the Personal Choices program, J.H.C.'s case manager advised Cristi that J.H.C. had been "awarded" six hours per week of Personal Care, and six more of Homemaker. However, J.H.C.'s Spending Plan reflected that he was actually using 18 hours per week of services. In March 2023, J.H.C. was "awarded" 15 hours per week of Personal Care, 15 hours per week of Homemaker, and five hours per week of Unskilled Respite. Cristi is the worker who fulfills 30 of those hours, and J.H.C.'s grandmother, Sally, fulfills the remaining five hours.

29.     At a February 17, 2023 meeting with J.H.C.'s then-case manager and CAAC's "In-Home Services Division Director," Cristi requested that J.H.C.'s services be increased to 90 hours of Personal Care per week. The In-Home Services Division Director, without hesitation and in the first functional denial of Cristi's request, told Cristi that request could not be approved because no one worker may work 90 hours per week, pursuant to labor regulations. When Cristi pointed out that she was not asking to have a single worker work 90 hours per week, the In-Home Services Division Director then pivoted and claimed that a request for 90 hours could not be approved under the E&D Waiver's institutional cost limit (ICL). This was the second functional denial of Cristi's request. When Cristi pointed out that in-home care is almost universally less expensive than

---

[8] Unskilled Respite actually *is* a service that can be self-directed under the E&D Waiver. *See* Alabama Medicaid Agency, AL Home and Community-Based Waiver for the Elderly and Disabled at 4 (last visited February 12, 2024) available for download at https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list/80916 (hereinafter "E&D Waiver Application"). While not all individuals necessarily wish to self-direct Unskilled Respite services, recipients and families are consistently misinformed that Unskilled Respite cannot be self-directed, or that they cannot access Unskilled Respite as an entirely separate service if they are also self-directing some other services.

institutional care and asked what the exact ICL is, CAAC's In-Home Services Division Director said she would "look into it."

30.     Cristi then produced a detailed packet she had prepared with an in-depth overview of, among other things, J.H.C.'s daily support needs. Her attempts to explain J.H.C.'s needs fell on deaf ears. When Cristi tried to get a clear answer on how ADSS mandates service requests be assessed, the In-Home Services Division Director hedged for several minutes before finally admitting that there is no rubric against which requests are assessed; instead, requests are granted or denied based on the observation of whoever comes to the recipient's home. Cristi then asked the In-Home Services Division Director what she thought would be an appropriate quantity of hours for J.H.C.; the In-Home Services Division Director opined that she thought 30 hours per week was "actually pretty good" since J.H.C. was, at the time, in school for most of the day. Then, in a third functional denial, the In-Home Services Division Director, apparently unaware that there are 168 hours in a week, then told Cristi that her request for 90 hours per week could not be approved because the purpose of the E&D Waiver is not to provide round-the-clock care. The In-Home Services Director then asserted that ADSS "view[s] it as, if this individual is needing this much care, then they should be in a facility."

31.     In one single meeting, Cristi's request on J.H.C.'s behalf for increased services was denied three times. No process was provided. No review was given. The In-Home Services Director did not even provide consistent rationales for the repeated *ad hoc* denials.

32.     Nevertheless, due to Cristi's persistence, the request was escalated to ADSS's General Counsel. Although Cristi had presented, at the February 17 meeting, a detailed written request to increase J.H.C.'s hours and amend his services, ADSS still requested on March 14 that Cristi provide "a schedule/description of the specific tasks that fall under each type of service, how

often [. . .] each task is performed, and, [*sic*] how much time each task takes." Although neither federal nor state regulations require that a request for waiver services be accompanied by a detailed schedule in support of the same, Cristi—who is the mother of two other small children, in addition to being J.H.C.'s primary caretaker—undertook to create a new one. J.H.C.'s updated schedule was provided to ADSS on May 5, 2023, showing that J.H.C. required 150 hours per week of services, which included 118 hours per week of Personal Care and 28 hours per week of Homemaker services. J.H.C. had his "nurse assessment" on July 17, 2023. Again, no instrument, rubric, tool, or other guidelines were used in the evaluation of J.H.C.'s needs.

33.     On December 15, 2023, Cristi was advised that a decision had finally been made on J.H.C.'s hours. The In-Home Services Director who suggested institutionalizing J.H.C. requested a meeting with Cristi for December 18 to discuss the determination. A copy of the determination was not provided to Cristi, and her request to meet on a day when J.H.C.'s father and the family's attorney were both available to join was ignored. Ultimately, on December 19, 2023, after several days of back and forth, Cristi was permitted to see the determination. The only change in J.H.C.'s services was the addition of eight hours per week of Skilled Respite "to assist with performing skilled activities and provide respite for the family."[9] The only explanation provided for the refusal to increase the Personal Care and Homemaker services was that, "[b]ased on the nursing assessment performed, additional services hours are not supported." But the family was provided no explanation of how the results of the nursing assessment apparently failed to justify the requested increase in hours.

---

[9] Again, because of a dearth of providers in Alabama, E&D Waiver recipients cannot access the Skilled Respite service.

34.     J.H.C.'s family has appealed the determination, but ADSS has ignored their repeated requests for any documents relating to his nurse assessment.[10] ADSS is preventing J.H.C. and his family from exercising his due process right to lodge a meaningful challenge to the service award. Because ADSS is refusing to provide the documents to which J.H.C. and his family are entitled, it is impossible for them to know how ADSS determined the quantity of services to award and therefore impossible to effectively challenge it.

### E.  Kathryn "Katie" C.

35.     Katie C. is a 24-year-old woman living in Montgomery, Montgomery County, Alabama. Her waiver services are administered by CAAC. Katie has been on the E&D Waiver since about 2003. As an E&D Waiver recipient, Katie has a property interest in the services available to her under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. Katie brings this action through her mother, Cindy C.

36.     Katie has Wolf-Hirschhorn Syndrome, a genetic disorder resulting from a partial deletion on the "short arm" of the fourth chromosome. She is completely dependent on her parents for every aspect of her care. Katie depends on a g-tube for her nutrition. Katie has a tracheostomy and utilizes a "direct connect humidifier," which humidifies her air and concentrates the oxygen going directly to her trach. She is not able to toilet herself, so her parents must change her diapers. Katie's parents bathe her, administer her medications, and perform respiratory care (such as airway

---

[10] J.H.C. and his family are entitled to this information under both HIPAA regulations and Medicaid regulations. *See* 42 C.F.R. 164.502(g)(3)(i) (entitlement of parents as health representatives of minor children to obtain medical records); 42 C.F.R. 431.242(a) (mandating that the beneficiary or their representative must be given an opportunity to review their entire case file and all documents to be used by the agency at a Fair Hearing). Additionally, the imports of due process and fundamental fairness would dictate that J.H.C. must be provided with this information to be able to mount a meaningful challenge.

suctioning). During the night, someone must check on Katie every two hours to ensure that her breathing mask is properly placed, and that it has not collected "rainout," which occurs when heated air from breathing cools in the trach tubing and reaches the wearer's mask as water, causing their face to become damp. Katie's kidney disease has also recently progressed to the beginning stages of Level 4, increasing the level of care she needs.

37.     Difficulty getting hours sufficient to meet Katie's needs has been a long-standing issue. Between 2003 and 2016, Katie was only getting 1-3 hours per week of services. In 2016, when Katie got her tracheotomy, her services were increased to 35 hours per week. Her case manager at the time reported to Katie's mother, Cindy, that she had been told that 35 was the maximum possible number of hours that any recipient could receive. The case manager also advised Cindy that she had been told that, if Katie's family pushed for more hours, they would draw attention to themselves and that ADSS would potentially want to "audit" Katie's case. According to the case manager, "audits" sometimes resulted in families losing the ability to self-direct their services.[11] From then on, Cindy was too afraid to request more hours, in fear of reprisal from the agency.

38.     In January 2023, although the reimbursement rate for Personal Care was about $14 per hour, Cindy was only being paid minimum wage—$7.25 per hour—to provide Katie's care. Cindy began working to try and increase her pay in February 2023. She was initially told that her hourly rate was the "State of AL starting pay rate," and that it could not be changed. At a March 15, 2023 home visit, Cindy asked Katie's Personal Choices Counselor for a copy of Katie's Spending Plan. The Personal Choices Counselor became hostile and refused to give Cindy a copy

---

[11] A review of the E&D Waiver application and the applicable sections of the Alabama Administrative Code does not reveal a process by which requests to increase services can trigger "audits," nor that such a concept exists.

of the Spending Plan. She asked Cindy if she was in "that Facebook group that is spreading misinformation and causing trouble." The Personal Choices Counselor happened to have brought a trainee with her to that home visit, and she told Cindy that she had chosen to do so because Cindy had always been "one of the easy ones." She then told Cindy not to expect more hours because "Medicaid is not there to pay for [Katie's] 24/7 care."

39.     Despite her fears and the initial chilly reception she received when broaching the subject, Cindy explicitly initiated a request for an increase in Katie's hours on May 4, 2023. On May 10, Katie's Personal Choices Counselor told Cindy that the only ways to increase Katie's hours would be to decrease the hourly rate paid to Cindy for providing Katie's care (meaning that Cindy would be paid the same amount of money for providing Katie's care, just distributed differently), or to decrease the money Katie receives as part of the "Cash Needs" service (essentially forcing Katie to give up one service to cover another). On May 11, Cindy sent an email questioning this claim; the response she received was, "I will be able to send it to you on Monday when I return to the office" [*sic*]. At some point, Cindy's request on Katie's behalf came to the attention of ADSS' General Counsel, who backtracked on the original summary denial, and advised Cindy on June 20 that her request was under review. After seven months, it remains pending. No nursing assessment has been completed. No person-centered planning meeting has been held. No one has even asked Cindy specifically what she is hoping to obtain. Cindy also continues to fear reprisal from the agency.

### F.  Chesney F.

40.     Chesney F. is an 18-year-old girl living in Athens, Limestone County, Alabama. Her waiver services are administered by the Top of Alabama Regional Council of Governments (TARCOG). Chesney has been on the E&D Waiver since about 2017. As an E&D Waiver

recipient, Chesney has a property interest in the services available to her under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. Chesney brings this action through her mother, Kari F.

41.     Chesney has cerebral palsy and is quadriplegic. She also has a seizure disorder and is mostly nonverbal. Because Chesney is quadriplegic, she is entirely dependent on her mother for every aspect of her care.

42.     Chesney is currently approved for 50 hours per week of Personal Care, which her family self-directs through the E&D Waiver's Personal Choices option. Chesney's mother, Kari, has made multiple requests over the last six years to have Chesney's hours increased, including creating person-centered plans for Chesney on her own in an attempt to "justify" the need for hours, since Chesney's case managers would not make them. Kari has managed to eke out around 25 hours of increases over the course of six years, but this still is not sufficient to meet Chesney's needs.

43.     As with most children who are medically complex, Chesney's care has not simplified as she has gotten older. As Chesney has grown, it has become more demanding and strenuous for Kari to transfer her, bathe her, toilet her, and help with dressing. Even after Chesney's youngest sibling was born in 2019, Kari was not able to obtain an according increase in Chesney's hours, even though a change in the recipient's circumstances—such as a new baby in the household—can and should justify an increase in services.[12]

---

[12] Furthermore, federal law requires a comprehensive assessment of the waiver recipient's needs at the time they are admitted to the waiver and at least annually thereafter, in addition to anytime the recipient has a change in circumstances or at the recipient's request. *See* U.S. Department of Health and Human Services, Centers for Medicare & Medicaid Services, *Educating a Beneficiary About Their Person-Centered Plan for Home and Community-Based Services* (2015) (last visited

44.     In February 2023, Kari made a request for 168 hours per week of Personal Care; on July 27, 2023, over five months later, Kari was advised that she needed to obtain copies of progress notes from Chesney's physicians in support of the request—a task that is generally within the ambit of the case manager's responsibilities. On August 18, 2023, Kari sent yet another written request for a determination on Chesney's hours, which went ignored. On September 15, 2023, after seven months with no answers, Kari finally sent a formal complaint to, among others, the ADSS Assistant Commissioner. On September 21, 2023, the Assistant Commissioner told Kari that Chesney would need a "more intensive evaluation" of her needs, to "supplement the existing assessment process the case manager typically completes." The assessment finally took place on November 7, 2023.

45.     On December 18, 2023, ADSS decided to reduce Chesney's Personal Care hours from 50 hours per week to 42 hours per week, and move those eight hours into the Homemaker category, "based on tasks performed." ADSS also added 13 more hours of Homemaker services to Chesney's plan, as well as 16 hours per week of Skilled Respite "for service hours to assist with performing skilled activities and to provide respite for family."[13] Chesney's family was provided no further information on how this determination was made, nor how Chesney's nurse assessment apparently supported this award of services.

---

February 12, 2024) https://www.cms.gov/files/document/hcbs-inform-bene-about-care-plan-fs-102815pdf; U.S. Department of Health and Human Services, Centers for Medicare & Medicaid Services, *State Medicaid Manual*, § 4442.5(A) (1999) (last visited February 12, 2024), available for download at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html (hereinafter "State Medicaid Manual").

[13] Again, although Skilled Respite seems to be the only service ADSS will willingly increase, due to a lack of providers, awarding that service to waiver recipients does nothing to aid in their care. However, it does relieve ADSS of the obligation to pay for additional services, as the Skilled Respite service cannot be staffed, anyway.

46.     Chesney's family has appealed the determination, but ADSS has ignored their repeated requests for any documents relating to Chesney's nurse assessment.[14] ADSS is preventing Chesney and her family from exercising Chesney's due process right to lodge a meaningful challenge to the service award. Because ADSS is refusing to provide the documents to which Chesney and her family are entitled, it is impossible for them to know how ADSS determined the quantity of services to award and therefore impossible to effectively challenge it.

**G.  Jamison F.**

47.     Jamison F. is a 30-year-old man living in Jemison, Chilton County, Alabama. His waiver services are administered by the Middle Alabama Area Agency on Aging (M4A). Jamison has been on the E&D Waiver since around 2014. As an E&D Waiver recipient, Jamison has a property interest in the services available to him under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. Jamison brings this action through his father and legal guardian, Ira F.

48.     Jamison is paralyzed from the neck down and has been ventilator-dependent since 2011. Because Jamison is quadriplegic and dependent on mechanical ventilation, he relies on his parents for all of his care, including all of his activities of daily living. Jamison's elderly parents, Ira and Holly, are exhausted from bearing sole responsibility for managing Jamison's care.

---

[14] Chesney and her family are entitled to this information under both HIPAA regulations and Medicaid regulations. *See* 42 C.F.R. 164.502(g)(3)(i) (entitlement of parents as health representatives of minor children to obtain medical records); 42 C.F.R. 431.242(a) (mandating that the beneficiary or their representative must be given an opportunity to review their entire case file and all documents to be used by the agency at a Fair Hearing). Additionally, the imports of due process and fundamental fairness would dictate that Chesney must be provided with this information to be able to mount a meaningful challenge.

49.     Jamison and his family have never been able to access sufficient services under the E&D Waiver. After Jamison's accident, the family lived in their basement for over a year because the rest of the house was not accessible to Jamison. Although the E&D Waiver offers Home Modifications as a service, Jamison has never been able to obtain that service, despite his parents' requests. Jamison's father, Ira, asked numerous times for an outline of what kind of modifications waiver funds would cover, but was never provided that information. Ultimately, a local church donated a wheelchair ramp to the family; they were able to have some Home Modifications done following donations from a local contractor and a fundraiser from Jamison's school; and Jamison's grandmother paid for an addition to the family's home.

50.     Currently, Jamison is approved for 64 hours of self-directed Personal Care per week. His father, Ira, provides care for 40 of those hours to the best of his physical abilities; a part-time worker provides the other 24. Jamison was receiving 68 hours per week of Personal Care before the beginning of the COVID-19 pandemic, but his hours were reduced during the pandemic to 40 per week, with no explanation as to why. After months of fighting, Ira was able to get "back" 24 additional hours per week, for a total of 64. This is still less than the amount of services Jamison was receiving before the pandemic. Yet, Jamison never received a formal notice that his services were being reduced, nor an opportunity to appeal the reduction.

**H. J.G.**

51.     J.G. is an eight-year-old boy living in Montgomery, Montgomery County, Alabama. His waiver services are administered by CAAC. J.G. has been on the E&D Waiver since about 2020. As an E&D Waiver recipient, J.G. has a property interest in the services available to him under the E&D Waiver. The administration of those services is therefore subject to the due

process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. J.G. brings this action through his mother, Gabrielle M.

52.     J.G. has diagnoses of cerebral palsy, autism, lung disease, and epilepsy. He also requires supplemental oxygen at all times, and has a visual impairment. J.G. is nonverbal and non-ambulatory, and he relies on his mother, Gabrielle, for all of his care and assistance with his ADLs, including eating and toileting.

53.     Initially, J.G. was approved for 12 hours per week of Personal Care services, which his family chooses to self-direct through the Personal Choices program. Given the level of J.G.'s needs, this was not adequate for him. Gabrielle has requested an increase in J.G.'s hours, as well as the addition of different waiver services, multiple times, including following hospitalizations and declines in J.G.'s health. Gabrielle did not know she could request a specific number of hours, so she has only ever requested "an increase." Gabrielle feels that 40 hours per week of Personal Care would be the minimum amount sufficient to meet J.G.'s needs.

54.     Gabrielle's requests to increase J.G.'s services have all been denied, but never in writing. Until May 2023, Gabrielle had been under the impression that J.G. was approved for 17 hours per week of Personal Care. She only found out when she was finally able to obtain a copy of J.G.'s Spending Plan that he was only approved for 12 hours, and that his worker had been working 17 hours per week at a lower pay rate. Recently, J.G. has begun having more seizures, which increases his risk of falls. Gabrielle thus yet again requested more hours, but her request was not granted at that time, even though she provided proof of J.G.'s increased falls and seizures.

55.     Gabrielle has no input into J.G.'s care plan and has no idea what the listed goals are. Even though Gabrielle has continued to provide proof of J.G.'s increased falls and seizures, and although his case manager is documenting falls almost every visit, multiple case managers

have answered Gabrielle's requests for increased services with simply, "They said no." But no one ever explains to her who "they" are.

56.     ADSS's failure to allow Gabrielle to participate in the creation of J.G.'s care plan— as is her right under federal law—is perfectly illustrated by a minimal increase in hours that J.G. did receive in September 2023. Apparently, his case manager at the time responded to Gabrielle's numerous reports of J.G.'s increased seizures and falls by soliciting from ADSS an increase of five hours of Personal Care for J.G., bringing him from 12 hours to 17 hours per week of Personal Care. While the small increase was a positive development, Gabrielle did not make this request and had no input into it. After the hours were awarded, Gabrielle had questions she wanted to discuss with her Personal Choices Counselor (another type of case manager), but the Personal Choices Counselors do not regularly visit Gabrielle and J.G., so she never had the opportunity to do so. J.G. now has a worker who works 25 hours per week, but they are only paid for 17.

57.     In January 2024, Gabrielle again expressed J.G.'s need for additional services, suggesting that 40 hours a week of Personal Care would be helpful. J.G.'s case manager told her they could "try for" 40 hours at J.G.'s redetermination meeting in March 2024.[15] The case manager did not schedule or even discuss with Gabrielle an assessment or a person-centered planning meeting in connection with this request.

### I.   Zahari W.

58.     Zahari W. is an 18-year-old young man living in Pell City, St. Clair County, Alabama. His waiver services are administered by M4A. Zahari has been on the E&D Waiver

---

[15] Federal law provides that changes to a Medicaid waiver recipient's person-centered plan can be made at a variety of junctures, including when there is a change in the person's health condition (such as an increase in seizures and falls); there is no requirement that the recipient wait until an arbitrary date like his annual eligibility redetermination meeting to have his services increased or otherwise changed. *See generally State Medicaid Manual* at § 4442.6.

since 2022. As an E&D Waiver recipient, Zahari has a property interest in the services available to him under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. Zahari brings this action through his mother, Courtney W.

59.     Zahari has diagnoses of retinopathy of prematurity (an eye disease occurring in babies who are premature or who weigh less than three pounds at birth), autism, an intellectual disability, and severe apraxia of the body, a neurological disorder essentially causing Zahari to lack the ability to carry out skilled movement and gestures. Zahari is nonverbal and requires almost complete assistance with his ADLs. He cannot bathe, toilet, or feed himself independently. Although Zahari is completely blind, he will not use his cane consistently, significantly increasing his risk of injury. When Zahari is not in his specialized medical bed—a "safe sleep" bed which he can be zipped into from the outside to prevent escape—he requires constant supervision for his own safety.

60.     On July 22, 2023, Zahari's mother, Courtney, sent a detailed email to Zahari's case manager, requesting an increase from 30 hours to 84 hours per week of Personal Care. On August 29, 2023, having heard nothing in response to her request, Courtney reached out to ADSS's General Counsel for additional information. At that point, Courtney was told that there was no record in ADSS's internal system that she had made a request to increase Zahari's hours. On September 6, 2023, Zahari's case manager advised Courtney that Zahari would not be granted more hours because he had not experienced a decline in his health. Courtney requested that the denial be provided in writing, but Zahari's case manager did not provide a written denial.

**J.  Umberto "Donny" L.**

61.     Donny L. is a 22-year-old man living in Chelsea, Shelby County, Alabama. His waiver services are administered by M4A. Donny has been on the E&D Waiver since at least 2017. As an E&D Waiver recipient, Donny has a property interest in the services available to him under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. Donny brings this action through his mother, Eva L.

62.     Donny has autism (but not an intellectual disability) and is nonverbal. However, he can communicate effectively using a communication board. Donny has a mitochondrial disorder, hypogammaglobulinemia (an immune deficiency disorder where antibody levels within the body are insufficient to protect from infectious diseases), epilepsy, ataxia, apraxia, and GI issues including gastroparesis (a type of stomach paralysis that slows or completely stops the movement of food from an affected person's stomach to their small intestine), cyclic vomiting syndrome, and acid reflux. Donny needs one-on-one assistance for most of his ADLs. His only form of nutrition is an "elemental formula," a type of formula containing proteins which have been completely broken down into their simplest forms (amino acids) and therefore require minimal digestive function.

63.     The E&D Waiver currently provides Donny 42 hours per week of Personal Care, which his family chooses to self-direct under the E&D Waiver's "Personal Choices" program. It is unclear who determined that 42 hours per week would be sufficient for Donny, and how that determination was made.  Based on Donny's level of need, his mother, Eva, has never found this level of service to be sufficient. Eva feels that 84 hours per week would be the minimum adequate number of hours to meet Donny's needs. Donny has also expressed many times that he needs more

help than his family is paid to provide. But Eva's past attempts to increase Donny's hours have gone exceptionally poorly.

64.     Eva's December 2021 request for more hours ended in disaster when Donny's case manager responded by reporting Eva to the Alabama Department of Human Resources (DHR), the agency which operates Alabama's Adult Protective Services program. Although the DHR investigation obviously did not reflect that Donny was experiencing any abuse or neglect, this was still a very upsetting and traumatic experience for both Donny and Eva.

65.     For a year, Eva was too afraid to broach the possibility of additional hours with any of Donny's case managers. But in December 2022, Eva decided to try again. She asked Donny's then-case manager (the eighth one he had had in about a two-year period) about a possible increase in hours; the case manager immediately responded that "they" would "put [Donny] in a nursing home" if Eva wanted more hours. The case manager later relented and said she would ask her supervisor about an increase in hours. But at a meeting with Eva and Donny in January 2023, the case manager simply advised Eva that "we don't give that many hours." When Eva told the case manager that she felt the family needed 84 hours a week to continue to sustain Donny's care, the case manager told Eva that she did not "seem happy" and could simply choose "not to be on the program." Her request received no further follow-up.

66.     Since then, Donny and Eva have both requested hours increases multiple times. But their requests fall on deaf ears, never receiving any follow-up. Donny has not had a nurse assessment, or any kind of review of his requests at all. At a recent home visit, Donny expressed his frustration at not being able to adequately compensate the family members who provide his care. The case manager who was visiting him acknowledged to Donny that that "sound[ed] hard," but still did not make any efforts toward initiating an increase in Donny's hours.

**K.  C.R.**

67.     C.R. is a seven-year-old girl living in Samson, Geneva County, Alabama. Her waiver services are administered by the Southern Alabama Regional Council on Aging (SARCOA). C.R. has been on the E&D Waiver since 2022. As an E&D Waiver recipient, C.R. has a property interest in the services available to her under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. C.R. brings this action through her mother, Samantha R.

68.     C.R. has cerebral palsy and an intellectual disability. She needs almost complete assistance with her ADLs. C.R. cannot independently manage her hygiene at any level. C.R.'s mother, Samantha—who is also the mother of an eight-year-old, a two-year-old, and an infant daughter—is responsible for most of C.R.'s care, including bathing C.R., brushing her teeth, cleaning her up after meals and activities, changing her diaper, and dressing her. C.R. also cannot eat or ambulate independently, so Samantha must assist her with those tasks.

69.     As of March 2023, C.R. received 10 hours per week of Personal Care and 10 hours per week of Homemaker services. At a home visit that month, Samantha described C.R.'s extensive care needs, and expressed that she felt C.R.'s awarded hours were very low. Without any further assessment, evaluation, or inquiry, C.R.'s case manager told Samantha she would "try" for four more hours. It was never made clear what service she would be "trying" to increase by four hours, or whether that request would be for four more hours per day or per week. At that same meeting, Samantha requested a copy of C.R.'s Spending Plan. The case manager refused to let her have it, citing the pending service increase as a justification. In May, Samantha found out from the case manager's supervisor that the request for increased hours was apparently made on the basis

27

that Samantha had just had a baby and was "overwhelmed," although Samantha never offered the new baby as the reason for the request and has consistently stated that the reason for the request was to better meet the level of C.R.'s needs.

70.     To Samantha's knowledge, there still has not been a determination of the request that C.R.'s case manager made in March. Additionally, no one has ever asked Samantha what level of services she is attempting to obtain for C.R.. On February 1, 2024, having gone nearly a year without any response to her request to increase C.R.'s hours, Samantha again requested an increase. It remains pending.

### L.  C.C.

71.     C.C. is a ten-year-old boy living in Birmingham, Jefferson County, Alabama. He is the brother of Plaintiff M.C. His waiver services are administered by RPCGB. C.C. has been on the E&D Waiver since about 2022. As an E&D Waiver recipient, C.C. has a property interest in the services available to him under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. C.C. brings this action through his mother, Denise C.

72.     C.C. has autism, cerebral palsy, and an intellectual disability. He also has cortical vision impairment, meaning that, in Denise's words, it is like C.C. sees the world "through a strainer." C.C. is also nonverbal, unable to ambulate, and needs assistance with all activities of daily living.

73.     C.C. currently receives 35 hours per week of Personal Care, which Denise chooses to self-direct through the Personal Choices program. Denise initially requested 40 hours per week of Personal Care for C.C., but was told she could only have 35 because she "wanted" to be paid

$15 per hour; apparently, C.C. being "approved" for more hours would have decreased Denise's hourly pay.[16] Although Denise's request was denied, she was never provided any written materials or an explanation of her due process rights.

74.     At some point in late 2023, Denise learned that C.C. is technically "approved" for 40 hours per week total between the Homemaker service and the Personal Care service. But she was told, again, that using the full 40 hours would decrease her pay, so she only uses 35 hours.[17] At a meeting with C.C.'s case manager in December 2023, Denise again requested an increase in hours or pay, expressing that she was struggling to feed her kids on her current wage. The case manager said that she "empathized," but that there was "nothing she could do." She did not address Denise's request for increased services other than to offer her the E&D Waiver's "Home-Delivered Meals" service.[18]

**M. M.C.**

75.     M.C. is a six-year-old boy living in Birmingham, Jefferson County, Alabama. He is the brother of Plaintiff C.C. His waiver services are administered by RPCGB. M.C. has been on the E&D Waiver since about 2022. As an E&D Waiver recipient, M.C. has a property interest in the services available to him under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth

---

[16] As with Katie C., this explanation simply does not make sense. An actual approval of 40 hours per week of Personal Care for C.C. would mean that Denise, as his employee, would get paid the full hourly rate to provide him 40 hours per week of care, and C.C.'s monthly budget would reflect that.

[17] Redistributing Denise's 35 hours' worth of pay to cover 40 hours of work is not an approval for 40 hours.

[18] Which is only available to waiver recipients over the age of 21. Alabama Medicaid Agency, *Provider Manual 107: Waiver Services*, 32 (last visited February 12, 2024) https://medicaid.alabama.gov/content/Gated/7.6.1G_Provider_Manuals/7.6.1.1G_Jan_2024/Jan24_107.pdf.

Amendment to the United States Constitution. M.C. brings this action through his mother, Denise C.

76.    M.C. has Down Syndrome, autism, and retinal detachment. He is completely dependent on Denise for all his activities of daily living. M.C. is nonverbal but does seem to understand English.

77.    M.C. currently receives 35 hours per week of Personal Care, which Denise chooses to self-direct through the Personal Choices program. Denise initially requested 40 hours per week of Personal Care for M.C., but was told she could only have 35 because she "wanted" to be paid $15 per hour; apparently, M.C. being "approved" for more hours would have decreased Denise's hourly pay.[19] Although Denise's request was denied, she was never provided any written materials or an explanation of her due process rights.

78.    At some point in late 2023, Denise learned that M.C. is technically "approved" for 40 hours per week total between the Homemaker service and the Personal Care service. But she was told, again, that using the full 40 hours would decrease her pay, so she only uses 35 hours.[20] At a meeting with M.C.' case manager in December 2023, Denise again requested an increase in hours or pay, expressing that she was struggling to feed her kids on her current wage. The case manager said that she "empathized," but that there was "nothing she could do." She did not address

---

[19] As with Katie C., this explanation simply does not make sense. An actual approval of 40 hours per week of Personal Care for C.C. would mean that Denise, as his employee, would get paid the full hourly rate to provide him 40 hours per week of care, and C.C.'s monthly budget would reflect that.

[20] Redistributing Denise's 35 hours' worth of pay to cover 40 hours of work is not an approval for 40 hours.

Denise's request for increased services other than to offer her the E&D Waiver's "Home-Delivered Meals" service.[21]

### N. H.G.

79.      H.G. is a 17-year-old girl living in Enterprise, Coffee County, Alabama. Her waiver services are administered by SARCOA. H.G. has been on the E&D Waiver since 2023. As an E&D Waiver recipient, H.G. has a property interest in the services available to her under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. H.G. brings this action through her mother, Jacklyn (Jackie) G.

80.      H.G. has Rett Syndrome, a rare genetic disorder that affects the development of the brain. Children with Rett Syndrome typically develop normally for the first six months of their life, but then experience severe regression in their development, losing abilities they had already developed, such as spoken language and purposeful hand movements. Most individuals with Rett Syndrome are "total care," as is H.G.. As a result of the Rett Syndrome, H.G. is nonverbal and has scoliosis, seizures, an intellectual disability, and severe contractures of the legs, knees, and hips. At the time of her adoption, H.G. could only feed via a g-tube, but with the care and support of her parents, she is able to eat solid food with only occasional tube feeds and water via g-tube.

81.      In 2022, H.G.'s parents adopted her from the Montgomery Children's Specialty Center (MCSC), a pediatric skilled nursing facility in Montgomery, Alabama. H.G.'s parents are

---

[21] Which is only available to waiver recipients over the age of 21. Alabama Medicaid Agency, *Provider Manual 107: Waiver Services*, 32 (last visited February 12, 2024) https://medicaid.alabama.gov/content/Gated/7.6.1G_Provider_Manuals/7.6.1.1G_Jan_2024/Jan24_107.pdf.

uniquely qualified to raise a child with Rett Syndrome, having raised another daughter with Rett Syndrome, Amber, until her passing at the age of 19.

82.     H.G. was severely neglected at MCSC. When she was adopted, she was sent home with one diaper, three days' worth of enteral formula, a dirty extension for her g-tube, and a urine-soaked wheelchair. Due to the neglect, H.G. had declined significantly while at MCSC, and ended up needing more care than her parents initially realized she would. In Jackie's words, "it took several months of transfers, repositioning, and nighttime wake-up calls to comfort [H.G.] and get her to the point where she no longer flinches when moved."

83.     H.G.'s parents applied for the E&D Waiver on her behalf in April 2023. In June 2023, at their first intake meeting, a representative from SARCOA suggested that five hours of care per week for H.G. would be sufficient. In July, H.G.'s family had their first meeting with H.G.'s case manager, who suggested that 21 hours per week would be sufficient. H.G.'s parents advised that would not be sufficient, and that they were looking to provide H.G. with 80 hours of Personal Care per week, with each of them to work 40 of those hours and Jackie's father to serve as Employer of Record (EOR). From July until November 2023, Jackie made numerous requests for ADSS to award H.G. 80 hours per week of Personal Care. Up until September, Jackie was even fighting to get H.G.'s nurse assessment done; ADSS initially refused to send the nurse assessor out to evaluate H.G., contending that a nurse assessment was "not necessary."[22]

_____

[22] This refusal was especially shocking considering the nurse assessor herself asserting multiple times earlier in 2023 that ADSS was attempting to develop a standardized process for assessing requests for services—presumably to include a nurse assessment. Furthermore, federal law requires a comprehensive assessment of the waiver recipient's needs at the time they are admitted to the waiver and at least annually thereafter, in addition to anytime the recipient has a change in circumstances or at the recipient's request. *See* U.S. Department of Health and Human Services, Centers for Medicare & Medicaid Services, *Educating a Beneficiary About Their Person-Centered Plan for Home and Community-Based Services* (2015) (last visited February 12, 2024)

84.     Finally, in November, ADSS awarded H.G. 25 hours per week of Personal Care, and 25 hours per week of the Homemaker service.[23] H.G.'s parents remain firm that this is not an adequate service award to meet H.G.'s needs. However, because H.G. is so desperately in need of care, her parents had to make the difficult decision not to appeal the service award. And although ADSS made its determination on H.G.'s hours in November, her inadequate services still did not start until December 22, 2023.

### O.  O.E.

85.     Plaintiff O.E. is one year old and lives in Ohatchee, Calhoun County, Alabama. His waiver services are administered by the East Alabama Regional Planning and Development Commission (EARPDC). O.E. has been on the E&D Waiver since 2023. As an E&D Waiver recipient, O.E. has a property interest in the services available to him under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. O.E. brings this action through his mother, Katie E.

86.     O.E. has diagnoses of short bowel syndrome secondary to a history of necrotizing enterocolitis (a disease affecting premature or low birth weight infants where poor blood flow and infection cause tissue death in the intestines), and related intestinal failure. Because O.E. has intestinal failure, he receives total parenteral nutrition (TPN) (nutrition administered entirely intravenously). O.E. also has a tracheotomy and is on a ventilator, and he has a g-tube and a central

---

https://www.cms.gov/files/document/hcbs-inform-bene-about-care-plan-fs-102815pdf; *State Medicaid Manual* at § 4442.5(A).

[23] H.G. was also awarded 14 hours per week of Skilled Respite "to assist with performing skilled activities and provide respite for [*sic*] family." Of course, as discussed throughout this complaint, that service award was meaningless as there are apparently no providers in Alabama to provide the Skilled Respite service.

line. O.E. receives TPN for 18 hours a day. When he first started TPN, he became septic and was seriously ill. He was on rescue lipids (lipid emulsion therapy) and was in complete organ failure for six months. Now O.E. is on six-day lipids, meaning he receives TPN six days out of the week and has one day "off." At one point, O.E. was introduced to food by mouth, but it caused him to go into anaphylactic shock.

87.    O.E. was born on March 19, 2022, and spent the first 244 days of his life—until November 18, 2022—in the hospital. In January 2023, Katie attempted to apply for the E&D Waiver on O.E.'s behalf. In March, having heard nothing about O.E.'s application, Katie contacted EARPDC. At that time, she was told that O.E. had never been "entered in" to ADSS's system, and that she would need to restart his application. So, she did. And, after months of following up, Katie was finally provided with the 204/205 Medicaid Waiver application form in July—six months after she attempted to initiate O.E.'s application. O.E.'s first home visit took place in September, at which point his application was denied because ADSS "wanted more information," although the information the agency apparently needed was not made clear to Katie.[24]

88.    O.E. was ultimately admitted to the waiver on December 29, 2023. At that time, he was "approved" for 15 hours per week of a service, although it was not made clear to Katie how the determination was made that 15 hours per week would be sufficient for O.E., nor was it made clear what service he had been approved for. When Katie expressed to O.E.'s case manager that she did not feel the award of 15 hours was sufficient, O.E.'s case manager said she would try to get O.E. 30 hours per week, but that she knew "they" would not approve that. She was not provided a written denial or any indication of her due process rights. Katie was then further advised that

---

[24] Because O.E. has a g-tube, a central line, and a tracheotomy, his eligibility for the E&D Waiver under Ala. Admin. Code § 560-X-10-.10 and Ala. Admin. Code § 560-X-36-.02 should have been self-evident.

O.E. would not be able to begin receiving services for another three to four months due to ADSS's recent disastrous transition to a new financial intermediary.[25]

**P. D.L. L.**

89.     Plaintiff D.L. is a three-year-old girl who lives in Toney, Madison County, Alabama. She is the sister of Plaintiffs M.L. and A.L. Her waiver services are administered by TARCOG. D.L. has been on the E&D Waiver since 2023. As an E&D Waiver recipient, D.L. has a property interest in the services available to her under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. D.L. brings this action through her mother, Catrina L.

90.     D.L. has diagnoses of Down syndrome, bronchopulmonary dysplasia (a chronic lung disease resulting from tissue destruction within the lungs and the airways), a heart defect, hypertension, thyroid dysfunction, and a developmental delay. D.L. is also dependent on oxygen and is fed via g-tube. She is nonverbal but can communicate to an extent via ASL.

---

[25] The financial intermediary, or Financial Management Services Agency (FMSA), is the entity that controls the money allotted to individuals who choose to self-direct their waiver services. In December 2023, ADSS ended its contract with Allied, the previous FMSA, and entered into a contract with a company called Acumen to serve as the new FMSA. The transition to Acumen has been nothing short of catastrophic. Waiver recipients who self-direct their services have been unable to consistently pay their workers due to Acumen and ADSS's mismanagement of the transition; budgets are being incorrectly reported to Acumen so recipients do not have access to the full amount of their waiver money; and a data breach that occurred during the early weeks of the transition resulted in the personally-identifiable information (PII) of over 7,000 people being viewable to anyone logging into the Acumen client portal. *See* Savannah Tryens-Fernandes, *Families of disabled children scramble to pay bills, buy food as Alabama misses payments*, AL.com (Jan. 22, 2024 12:30 PM), https://www.al.com/news/2024/01/families-of-disabled-children-scramble-to-pay-bills-buy-food-as-alabama-misses-payments.html. The data breach has not been fully remediated as of filing, and the financial issues continue to persist.

91. When D.L. was initially admitted to the E&D Waiver, she was awarded 35 hours per week of services, including seven hours per week of Companion service, 14 hours per week of Homemaker, and 14 hours per week of Personal Care. In August 2023, Catrina requested an increase to 80 hours per week of care for D.L., with Catrina to provide 40 of those hours and D.L.'s father, Caleb L., to provide the other 40. Although that request has been pending for roughly 10 months, no nurse assessment or person-centered planning meeting has taken place. Catrina has never received any kind of written denial or other determination regarding her request. Catrina asks for an update on her request at every monthly meeting, but she is repeatedly told only that the request is "being reviewed."

**Q. M.L. L.**

92. Plaintiff M.L. is a 10-year-old boy who lives in Toney, Madison County, Alabama. He is the brother of Plaintiffs D.L. and A.L. His waiver services are administered by TARCOG. M.L. has been on the E&D Waiver since 2023. As an E&D Waiver recipient, M.L. has a property interest in the services available to him under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. M.L. brings this action through his mother, Catrina L.

93. M.L. has diagnoses of post-traumatic stress disorder, disruptive mood dysregulation disorder, autism spectrum disorder, and bipolar disorder. He requires supervision at all times and needs some assistance with his ADLs. M.L. currently receives five hours per week of Companion service, five hours of Homemaker, and five hours of Personal Care. When M.L. was initially admitted to the waiver, Catrina asked that Skilled Respite be added to his plan of care. M.L.'s case manager advised that there were no providers for the service and refused to add it to

M.L.'s care plan. At the intake meeting for M.L.'s waiver eligibility, Catrina was told that his hours would be discussed during the "spending plan meeting." But at that meeting, M.L.'s case manager arrived with a spending plan already completed. Catrina asked to discuss M.L.'s hours, but was told he would not be approved for any more hours without filing a formal request. No further progress on increasing M.L.'s services has been made.

### R.  A.L. L.

94.      Plaintiff A.L. is a 15-year-old girl who lives in Toney, Madison County, Alabama. She is the sister of Plaintiffs D.L. and M.L. Her waiver services are administered by TARCOG. A.L. has been on the E&D Waiver since 2023. As an E&D Waiver recipient, A.L. has a property interest in the services available to her under the E&D Waiver. The administration of those services is therefore subject to the due process protections of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. A.L. brings this action through her mother, Catrina L.

95.      A.L. has Type 1 diabetes, and she went into a diabetic coma in late 2022. Although A.L. thankfully survived, she lost function in half of her body, as well as her ability to swallow. She also developed deficits in her executive function, and speech difficulties. Although swallowing therapy and speech therapy have helped her recover to an extent, A.L. still struggles. A.L. also suffers from depression and anxiety, and she utilizes a wheelchair, crutches, and a leg brace.

96.      While A.L. is able to handle most of her ADLs, she requires monitoring for pressure sores from her leg brace, as she would not be able to feel them developing due to the loss of function. Due to her newly developed executive function deficits, A.L. also needs assistance managing her medication, as well as her blood sugar monitor and insulin pump.

97.     A.L. currently receives five hours per week of Companion services, five hours of Homemaker services, and five hours of Personal Care. When A.L. was initially admitted to the waiver, Catrina asked that Skilled Respite be added to her plan of care. A.L.'s case manager advised that there were no providers for the service and refused to add it to A.L.'s care plan. At the intake meeting for A.L.'s waiver eligibility, Catrina was told that her hours would be discussed during the "Spending Plan meeting." But at that meeting, A.L.'s case manager arrived with a Spending Plan already completed. Catrina asked to discuss A.L.'s hours, but was told she would not be approved for any more hours without filing a formal request. Catrina also attempted to discuss the Home Modification service with A.L.'s case manager, but was told only that the limit was around $500[26], and that "they" had never been able to get Home Modifications approved. No further progress on increasing A.L.'s services has been made.

## IV.    STATEMENT OF FACTS

### A.  Alabama has chosen to participate in Medicaid, so it must comply with federal law as related to its participation in the Medicaid program.

98.     The Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-5, establishes a program for medical assistance that is cooperatively funded by state and federal governments.  The Medicaid program exists for the purpose of enabling states to furnish "medical assistance on behalf of . . . aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services," and "to help such families and individuals to attain or retain capability for independence or self-care[.]" 42 U.S.C. § 1396-1.

---

[26] The limit is actually $5,000, and Home Modifications can exceed that limit at ADSS's discretion. *See* Alabama Medicaid Agency, *Provider Manual 107: Waiver Services*, 42 (last visited February 12, 2024) https://medicaid.alabama.gov/content/Gated/7.6.1G_Provider_Manuals/7.6.1.1G_Jan_2024/Jan24_107.pdf.

Participation in the Medicaid program is optional; states are not required to establish medical assistance programs. But once a state chooses to participate in the Medicaid program, it is bound to comply with the Medicaid Act's requirements, as well as those of its implementing regulations. *See* 42 U.S.C. § 1396(a).

99.     Regulatory standards adopted by the co-administrators of the state Medicaid program regarding the extent of medical assistance must be reasonable and consistent with the objectives of the Medicaid Act. 42 U.S.C. § 1396a(a)(17). Medical assistance provided to one recipient must not be less in duration, scope, or amount than that which is provided to another recipient. 42 U.S.C. § 1396(a)(10)(B). Each service covered by a state Medicaid plan must be sufficient in amount, duration, and scope to reasonably achieve its purpose. 42 C.F.R. § 440.230(b). Perhaps most importantly, states must ensure that any care and services furnished by their Medicaid programs will be provided "in the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

100.     Alabama has chosen to participate in the Medicaid program. For Fiscal Year 2023, Alabama's Federal Medical Assistance Percentage (FMAP) was 72.43%, meaning that the federal government funded more than 72% of Alabama's Medicaid program that year. *Federal Medical Assistance Percentages and Enhanced FMAPs by State, FYs 2020–2023*, MACPAC https://www.macpac.gov/wp-content/uploads/2022/12/EXHIBIT-6.-Federal-Medical-Assistance-Percentages-and-Enhanced-FMAPs-by-State-FYs-2020-2023.pdf (last visited February 12, 2024). As a condition of Federal Financial Participation (FFP), or federal funding of Alabama's Medicaid program, Alabama bears the responsibility to ensure that its participation in the Medicaid program complies with federal law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("[I]n return for federal funds, the States agree to comply with federally imposed conditions").

101.    Federal law, in turn, imposes a substantive duty on states to provide medical assistance, as the Eleventh Circuit has recognized. *See Fla. Pediatric Soc'y v. Benson*, 2009 U.S. Dist. LEXIS 139312 *1, *11-*12 (S.D. Fla. Sept. 30, 2009) (recognizing enforceable right to access to adequate medical assistance), *Doe by and Through Doe v. Chiles*, 136 F. 3d 709, 723 (11th Cir. 1998) (concurring opinion) (citing *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498 (1990)); *see also Harris v. James*, 127 F. 3d 993, 1012 (11th Cir. 1997) (recognizing a statutory right to medical assistance).

102.    Federal law further requires that states designate a Single State Agency to "administer or supervise the administration of" the state's Medicaid plan; part of this responsibility is that the Single State Agency must promulgate "rules and regulations . . . that are binding upon local agencies that administer the [Medicaid State Plan]." *See* 42 U.S.C. § 1396a(a)(5), 42 C.F.R. § 431.10(b). It is permissible for the Single State Agency to delegate administrative authority for its Medicaid programming to local agencies, such as Alabama Medicaid has delegated the administrative responsibility for the E&D Waiver to ADSS. But implicit in the regulatory scheme governing the creation and existence of a Single State Agency is the responsibility of the Single State Agency for ensuring that any local agencies to whom it delegates administrative authority comply with federal law in their administration of the state's Medicaid plan. Essentially, an agency "cannot evade federal requirements by deferring to the actions of other entities." *K.C. v. Shipman*, 716 F. 3d 107, 112 (4th Cir. 2013).

103.    The E&D Waiver is one of seven HCBS waivers that the State of Alabama currently operates. As set forth above, Alabama Medicaid has delegated the responsibility for the day-to-day administration for the E&D Waiver to ADSS, which has further delegated administration of the E&D Waiver to its regional arms, called "Area Agencies on Aging" (AAAs).

40

104.     There are 13 AAAs in Alabama, each of which serves one or more counties. Some AAAs, like the Alabama Tombigbee Regional Commission in southwestern Alabama, serve as many as ten counties. Others, like the United Way Area Agency on Aging of Jefferson County, serve only a single county.[27] AAAs are responsible for, among other things, maintaining the "referral lists" for the E&D Waiver, making eligibility determinations, and managing the waiver "slots" allocated to each region. AAAs are also responsible for case management, which is supposed to entail "locating, coordinating, and monitoring a group of services." Ala. Admin. Code § 560-X-36-.04(a).

105.     The E&D Waiver offers the following services: Case Management, Homemaker Services, Personal Care, Adult Day Health, Respite Care (Skilled and Unskilled), Adult Companion Services, Home Delivered Meals, Pest Control, Skilled Nursing (both through registered nurses and licensed practical nurses), Home Modification, Assistive Technology and Durable Medical Equipment, the installation and monitoring fees for a Personal Emergency Response System (PERS), Medical Supplies, and Supervisory Visits. *See* E&D Waiver Application.

106.     The E&D Waiver has no age requirements for eligibility. Its eligibility criteria simply require that applicants meet the criteria for nursing facility level of care (NF LOC or LOC) as defined by Alabama regulations. *See* Ala. Admin. Code § 560-X-36-.02, Ala. Admin. Code § 560-X-10-.10. The regulations do not define how it is determined that an individual meets the NF

---

[27] Jefferson County also further divides its responsibilities between the United Way Area Agency on Aging, which manages services provided under the Older Americans Act, and the Regional Planning Commission of Greater Birmingham, which manages the E&D Waiver for Jefferson County.

LOC criteria, nor do they define the criteria taken into consideration when determining how individuals are allotted services.

107.    Although the State of Alabama has developed procedures to provide notice and a hearing to any E&D Waiver beneficiary or prospective beneficiary whose services are denied, reduced, and/or terminated, ADSS acts as a gatekeeper to due process, consistently refusing to provide legally sufficient notice to E&D Waiver beneficiaries or prospective beneficiaries of adverse decisions, and refusing to allow aggrieved E&D Waiver beneficiaries or prospective beneficiaries to access the state's procedures for challenging adverse decisions relating to their services; as such, waiver enrollees are entirely prohibited from exercising their right to do so.

### B. Defendants consistently fail to provide E&D Waiver recipients the due process protections required by the Medicaid Act and the Fourteenth Amendment to the United States Constitution.

#### i. Defendants do not provide waiver recipients with adequate notice and an opportunity for a Fair Hearing any time their Medicaid waiver services are reduced or terminated, or any time their requests for services are denied.

108.    Plaintiffs, as E&D Waiver program enrollees, are entitled to adequate notice and an opportunity for a Fair Hearing any time their Medicaid waiver services are reduced or terminated, or at any time that their requests for Medicaid waiver services are denied. *See* 42 U.S.C. § 1396a(a)(3), 42 C.F.R. § 431.00, *et seq*; *see also* 42 C.F.R. § 431.210 (parameters for what the notice must include). In particular, due process requires that any determination made regarding a Medicaid recipient's services must be supported by a reason sufficiently detailed to "allow the affected individual an effective opportunity" to challenge it. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970); *see also* 42 C.F.R. § 431.205(d), 431.210(b). In practice, none of this happens. But ADSS—as the primary gatekeeper to both services and due process—works to

circumvent providing required procedural protections to E&D Waiver enrollees in a variety of ways.

109.    In some cases, ADSS views the service-request process as a bargaining exercise, wherein a recipient asks for a certain type or quantity of services, ADSS makes a counteroffer, and the recipient can either take it or leave it. But ADSS does not consider that a denial. For example, the services "awarded" to Michaela M. in February 2023 were less than what she requested. Her original request was therefore functionally denied. But Michaela was not provided with a formal denial or notification of her due process rights for over a month afterward, and the denial notice was only issued following her mother's persistent requests for one. Michaela's brother, G.M., was also "awarded," in the form of a counteroffer, services less in amount, scope, and duration than what he had requested. Thus, G.M. still functionally experienced a denial of his request. Illustrating the arbitrary and inconsistent nature of how Defendant ADSS "provides" due process in response to requests for services, G.M. *did* receive a notice of his appeal rights when his request for services was denied. And yet, it did not include any indication of how ADSS arrived at its determination of what services would be "appropriate" for G.M.. K.G., Chesney, H.G., and J.H.C. were all awarded services less in amount, scope, and duration than what they had requested, but the notice of their appeal rights also did not include any indication of how ADSS arrived at its determination of what services to award. All of these notices were therefore *still* not legally sufficient.

110.    Similarly, when Jamison's parents, Ira and Holly, tried to have Jamison's Personal Care hours increased to the 68 hours per week that Jamison had been receiving before the COVID-19 pandemic, Defendants "gave" Jamison "back" 16 hours after prodding from Ira. After more prodding, Defendants "gave back" another eight hours, bringing Jamison to a total of 64 hours per week. Although this was less than the family requested, Jamison was provided no notice or

opportunity to appeal the either the initial reduction in services or the subsequent one resulting from his being "given back" fewer hours than he had initially lost.

111.    Some requests are simply summarily denied. As described above, J.H.C.'s request for increased hours was verbally denied three times in a single meeting, with different "justifications" offered for each denial. Katie's mother, Cindy, was simply told "not to expect more hours." Donny's mother, Eva, was told that "they don't give that many hours." J.G.'s requests for increased hours are always verbally denied. Zahari's request was ignored for over a month until his mother, Courtney, escalated it; it was then verbally denied six days later. In response to Denise's request for 40 hours per week for C.C. and M.C., she was simply told she could only have 35 due to the pay rate she "wanted." M.L. and A.L. were both verbally denied Skilled Respite because of a lack of providers.[28]

112.    Some individuals are even threatened in response to their requests for increased services—Donny's mother was reported to DHR, and Katie's mother was told she would be "audited" and risked losing the paltry hours Katie already had, were she to pursue her request for more.

113.    Still other individuals are not even provided the opportunity to make a request, much less advised of their due process rights as connected with a denial. O.E., D.L., M.L., and A.L. were all told how many hours they would be getting with no opportunity for their families to offer input or engage in a discussion surrounding the children's services.

114.    Finally, other requests are simply flounder in an indefinite limbo, constituting a constructive denial, but one which includes no notice. ADSS neglected Chesney's and J.H.C.'s

---

[28] While a lack of providers is a barrier to accessing the service, ADSS is not permitted to refuse to put it into a waiver recipient's plan of care as long as the recipient is eligible for the service.

requests for the better part of 2023. K.G.'s request sat untouched for more than four months before her nurse assessment, and then for another four months afterward.[29] ADSS has bounced Katie's request between different agency staff for months, with no final decision on or even review of it. C.R.'s case manager may have put in a request for four more hours of some service nearly a year ago; as of yet, no determination on that request has been made. Catrina was able to attempt a request to increase D.L.'s hours, but a determination has yet to be made on her request, even after many moths of asserted "review."

115.    Many recipients and families describe feeling "ghosted" by ADSS after they make requests for services. All the while, the needy individuals who Defendant ADSS chooses to ignore go without. And, because ADSS also acts as a gatekeeper to due process, individuals whose requests languish indefinitely have no way to challenge the lack of services.

116.    It is not just requests for new or additional services which are subject to these procedural failures, either. Jamison had his weekly Personal Care hours reduced from 68 to 40 at some point during the height of the COVID-19 pandemic because they were going "unused" due to Jamison's parents' fears about letting someone into their home, given that Jamison is on a ventilator and is immunocompromised. Ira and Holly, through their persistence, managed to "get back" 24 of the 28 hours that had been taken from Jamison during the height of the pandemic. Jamison therefore still experienced a reduction in his services, but was never provided with notice of or an opportunity to challenge the reduction.

117.    All of these individuals have experienced either a reduction in their services, or a functional denial of their request for additional services. Not one of them was provided legally

---

[29] Although all three requests ultimately received determinations within days of one another, those determinations were still legally insufficient, as described above.

sufficient due process protections. Although the State of Alabama has developed procedures to provide notice and a hearing to any E&D Waiver beneficiary or prospective beneficiary whose services are denied, reduced, or terminated, ADSS acts as a gatekeeper to due process, consistently refusing to provide legally sufficient notice to E&D Waiver beneficiaries or prospective beneficiaries of adverse decisions, and refusing to allow aggrieved E&D Waiver beneficiaries or prospective beneficiaries to access the state's procedures for challenging adverse decisions relating to their services; waiver enrollees are thus entirely prohibited from exercising their right to do so.

### ii. Defendants consistently fail to operate the E&D Waiver in accordance with the due process requirements of the Fourteenth Amendment.

118.     Entitlement programs like Medicaid must be administered fairly and consistently across all enrollees; Fourteenth Amendment due process requirements therefore necessarily apply when A) a Medicaid recipient is trying to enforce the services they have already been awarded, and B) when they are trying to seek additional services. *See, e.g.*, *Schweiker v. Gray Panthers*, 453 U.S. 34, 36-37 (1981); *see also Hamby v. Neel*, 368 F. 3d 549, 559 (6th Cir. 2004) ("Since Medicaid is a program established by Title XIX of the Social Security Act . . . Plaintiffs . . . have a property interest in the TennCare coverage for which they H.G. to qualify"), *Flatford v. Chater*, 93 F. 3d 1296, 1303-05 (6th Cir. 1996); *see also Richardson v. Perales*, 402 U.S. 389 (1971); *but see Evangelical Lutheran Good Samaritan Soc'y v. Randol*, 2017 U.S. Dist. LEXIS 113031 *1, *11 (D. Kan. Jul. 20, 2017).

119.     A waiver beneficiary's right to any waiver service depends on a finding, "'based on appropriate assessment criteria *that the State develops and applies fairly to all waiver enrollees*,'" that the beneficiary needs the service. *See Doe v. Kidd*, 501 F. 3d 348, 359 (4th Cir. 2007) (emphasis added) (internal citations omitted). This requirement is separate and apart from the requirements pertaining to appropriate person-centered planning, and it provides HCBS

recipients an additional level of protection against arbitrary determinations regarding their services. HCBS eligibility assessments, then, necessarily have two components. The first is a threshold "functional eligibility" assessment, which determines generally the prospective waiver recipient's level of care (i.e., whether they, at a basic level, meet the level of care required to be eligible for the waiver). The secondary component is a comprehensive needs assessment, which determines the type and intensity of support the individual requires. *See* Health Care Financing Admin., SMDL #01-006, Olmstead Update #4 (2000). Due process requires that Medicaid programs must be administered, and service needs evaluated, using clear, objective criteria that an individual can challenge. Defendants, however, do not have any standardized, consistent process by which they mandate the agencies must evaluate and respond to requests for services. Plaintiffs therefore experience arbitrary denials of their requests for services, because their needs are not being assessed in an objective, challengeable manner.

120. Additionally, because of Defendants' failure to administer the E&D Waiver in accordance with federal law, these denials are often not accompanied by proper notice, including the reasons for the denial and a notification that the denial can be appealed under Alabama administrative procedures. Even upon repeated requests, ADSS will not provide documentation indicating the reason for the denial, precluding aggrieved E&D Waiver enrollees from mounting a meaningful challenge to the same. Without proper notice of service denials and a meaningful opportunity to challenge them, Plaintiffs have not been given the opportunity to secure action by Defendants to rectify their lack of services and the injuries that flow therefrom. Plaintiffs' due process rights have therefore been violated.

C. **By arbitrarily allotting services to Plaintiffs without an individualized, person-centered assessment of their needs, Defendants have denied Plaintiffs their right to the legally sufficient care planning required by the Medicaid Act.**

121.     CMS mandates, through federal regulations, an individualized, person-centered assessment for the appropriate administration of waiver services. U.S. Department of Health and Human Services. *State Medicaid Manual* at 4442.6. At minimum, the agency must conduct a comprehensive assessment of the waiver recipient's needs at the time they are admitted to the waiver and at least annually thereafter, in addition to anytime the recipient has a change in circumstances or at the recipient's request. *See id*; *see also* 42 C.F.R. § 441.365 (requirements for periodic evaluation, assessment, and review).

122.     Federal regulations further establish a set of requirements that states must follow in the development of a waiver recipient's person-centered plan. These enumerated requirements are in place to ensure that "the person-centered service plan . . . reflect[s] the services and supports that are important for the individual to meet the needs identified through an assessment of functional need, as well as what is important to the individual with regard to preferences for the delivery of such services and supports." 42 C.F.R. § 441.301(c)(2). Importantly, among other requirements, the plan must reflect "the individual's strengths and preferences" and their "clinical and support needs as identified through an assessment of functional need," and it must "include individually identified goals and desired outcomes." *Id*. at (c)(2)(ii)-(iv). The person-centered plan must also be reviewed and revised upon a reassessment of functional need at least annually, but also when the individual's needs or circumstances change significantly, or at the request of the individual. *Id*. at (c)(3).

123.     The person-centered approach for the appropriate administration of waiver services, which CMS mandates through federal regulations, is almost wholly absent from the

administration of the E&D Waiver. As a threshold matter, none of the Plaintiffs have ever received an assessment that complies with the requirements set forth by 42 C.F.R. § 441.365. The "assessment" processes—both the one following initial admission to the waiver and the ones following annually thereafter—include little more than a meeting with a case manager (not the review team contemplated by 42 C.F.R. § 441.365(b)) to fill out basic paperwork. Further, there is no direct involvement by ADSS in conducting these assessments; instead, the responsibility for doing so is entirely delegated to the AAAs.[30] [31]

124.    This delegation to the AAAs raises two significant issues. First, it is an inappropriate delegation of tasks that are rightly in the ambit of the operating agency for the waiver—in this case, ADSS. *See generally* 42 C.F.R. § 431.10. Second, because there is no mandatory procedure that AAAs must follow when making such determinations, requests for services are assessed in an inconsistent and often arbitrary manner. Some case managers base their decisions on an "observation" of the person. Other case managers ask a "series of questions," but they have not been able to describe what those questions *are*, nor produce any kind of rubric or instrument reflecting the content of those questions. Still other case managers rely on what the waiver recipient's parent or caregiver relays to them, without personally interacting with or even so much as laying eyes on the waiver enrollee. The fact alone that there are so many methods of "assessment" renders ADSS's assessment process necessarily incompatible with the requirements of 42 C.F.R. § 441.365. But even if federal regulations permitted the use of multiple assessment

---

[30] It is possible that there is more direct involvement by ADSS in reviewing the results of the assessments discussed above; however, since the process is so inconsistent and opaque, it is not possible to know the extent of ADSS's involvement—if any—in this process.

[31] Some individuals do receive "assessments" by a nurse. However, as discussed throughout this complaint, ADSS's overall mismanagement of the waiver program makes it impossible to know the parameters or content of the nurse assessment, or how its results are utilized in determining the level of services that any waiver recipient will be awarded.

modalities, none of these methods of "assessment" comport with the requirements of 42 C.F.R. § 441.365.

125.    Of course, without legally sufficient assessment processes in place, there is no way to create legally sufficient person-centered plans. Without a meaningful assessment of the waiver recipient's needs, there is no way to create a person-centered plan based on their needs, as required by 42 C.F.R. § 441.301(c)(2). But the inadequacy of the person-centered planning process in which ADSS engages for E&D Waiver beneficiaries extends far beyond that necessarily created by the deficits in the assessment process.

126.    Due to ADSS's failure to implement any requirements for person-centered planning at the agency's highest levels, waiver recipients are left to contend with the arbitrary methods and standards by which any given case manager conducts any "planning" for their waiver services. Although case managers do meet with Plaintiffs and other E&D Waiver recipients on a monthly basis, the meetings are perfunctory and merely procedural; the primary focus is on the case manager completing paperwork and obtaining a list of any medical appointments the recipient may have had in the last month. The "meetings," in general, are little more than truncated home visits that allow just enough time for their parents and legal guardians to sign whatever paperwork is required to extend their services for another month. Requests for new or increased services do not trigger person-centered planning meetings that comply with federal law, nor do reported changes in the beneficiaries' circumstances.

127.    Each of the Plaintiffs has experienced inadequate person-centered planning in their own way. Michaela, K.G., J.H.C., and Chesney did not have true person-centered planning meetings in response to their requests for increased services; instead, each of them had a legally insufficient nurse assessment and then received a letter several months later informing them of

their service award. G.M. made a request for hours and then received an award that was less than what he requested nearly three months later; no meeting took place to review his needs. Katie's mother, Cindy, made a request to increase Katie's hours on May 4, 2023, and still no person-centered planning meeting has been held, nor any assessment conducted. Jamison had his hours arbitrarily reduced during the height of the pandemic and then partially "returned" to him later; no assessment was conducted related to either action, nor was a legally sufficient person-centered planning meeting held.

128.    J.G., Zahari, Donny, C.R., C.C., M.C., D.L., A.L., and M.L. have all had requests for increased services either summarily denied or completely ignored; no person-centered planning meeting or associated assessment appears to have even been considered in connection with their requests. O.E. was randomly awarded 15 hours per week of some service before any meeting (much less a meeting that comports with the person-centered planning requirements of federal law) had ever been held. H.G. had multiple "meetings" before her services even began in December 2023; obviously, no planning could have possibly taken place at these meetings, as H.G.'s request to increase her awarded services from 21 to 80 hours a week of Personal Care was still pending.

129.    In addition to ADSS's failure to hold person-centered planning meetings in the instances mandated by federal law, the processes of the meetings they *do* hold are also legally inadequate. In general, there is little, if any, discussion of the recipient's needs or the adequacy of their services. Meetings are rarely, if ever, held at times and places that are convenient to the individual; some individuals, like C.R., do not even get advance notice of the meeting and only find out about the meeting when the case manager turns up at their home. K.G., who is severely immunocompromised and often sick with various respiratory illnesses, has repeatedly requested that her monthly visits be held by phone as a reasonable accommodation and with support from

her doctor. But ADSS will not allow virtual visits and instead insists on putting K.G.'s health and safety at risk for a "meeting" with no substantive value. In stark contrast, Chesney's visits were held virtually until recently, despite Kari's repeated requests for them to be held in person.

130.    Some individuals do not understand the "planning" forms they are required to sign at the monthly home visits. For example, Jamison's parents, Ira and Holly, were given blank forms to sign that someone—it is unclear who—filled in after the fact. Donny's mother, Eva, reported that she and Donny are presented with a tablet to sign, but that it is unclear what they are actually signing. And although Donny is an adult and Eva is not his legal guardian or power of attorney, M4A still insisted for years that she sign the required paperwork on his behalf. But when ADSS finally recognized Donny as a legally competent individual and decided that he would be permitted to sign his own planning paperwork, the agency's staff has still refused to consistently honor Donny's requested accessibility accommodations, leaving him still often unable to meaningfully participate in the facsimile of "planning" it offered him.

131.    In sum, the planning process in which ADSS engages is so superficial and perfunctory as to be meaningless. Because of this, the amount, scope, and duration of services that any given E&D Waiver recipient receives is not based on their individual and specific needs as reflected in a person-centered plan, despite the fact that federal law mandates it should be. And so, perhaps unsurprisingly in light of the failures described above, not one of the Plaintiffs receives sufficient services to meet their needs.

132.    Overall, ADSS's "approaches" to person-centered planning, although varied, violate the law in many similar ways. Not only are the assessments and "person-centered planning" provided to Plaintiffs and the Plaintiff Class insufficient and violative of the rights of Plaintiffs and the Plaintiff Class under the Medicaid Act, but they further violate the rights of Plaintiffs and

the Plaintiff Class by precluding them from accessing the waiver services that they need and to which they are entitled.

### D. Defendants fail to provide E&D Waiver beneficiaries services with reasonable promptness.

133.   As a matter of federal law, states must provide Medicaid services, including home- and community-based services, to all eligible individuals with reasonable promptness. *See* 42 U.S.C. § 1396a(a)(8); *see also* 42 C.F.R. § 435.930(a) (states must furnish Medicaid services "without any delay caused by the agency's administrative procedures"). Defendants, however, fail to furnish Medicaid services to E&D Waiver beneficiaries with reasonable promptness, in part because of their failure to maintain any kind of standardized system for implementing and managing the E&D Waiver.

134.   The arbitrary or nonexistent assessment criteria that Defendants use in determining eligibility for services (including service changes or increases) causes recipients not to be offered services in a reasonably prompt manner. For example, the fact that Katie is approved for around 106 hours of Personal Care per month but is documented to actually be using 155 hours of Personal Care per month should be sufficient to indicate that Katie needs additional Personal Care hours— or at least to trigger a renewed assessment of her needs. But ADSS has no formalized procedure for such assessments, nor any concrete criteria that an individual must fulfill to have their services increased or otherwise modified. And so, Katie loses out. Despite her clear need for increased Personal Care hours, ADSS's failure to maintain a standardized procedure for assessing recipients' needs results in their failure to furnish those hours to Katie with reasonable promptness.

135.   Other Plaintiffs find themselves similarly affected by the Defendants' failure to maintain a standardized system for managing waiver services and their associated procedures. J.H.C.'s, K.G.'s, Chesney's, H.G.'s, and Michaela's requests to modify their services were met, if

slowly, with some kind of process, although the parameters of the "process" they were provided by way of a "nursing assessment" remain a mystery, making the service award arbitrary and therefore constituting a failure to offer needed services with reasonable promptness. Donny's, Zahari's, and J.G.'s requests were not afforded any amount of process, again resulting in ADSS failing to offer them needed services with reasonable promptness. G.M., J.G., C.R., C.C., M.C., O.E., D.L., M.L., and A.L. were all arbitrarily allotted some quantity of hours, but did not receive an assessment of their needs that complied with the requirements of federal law. As such, their service awards were arbitrary and not based on a true assessment of their actual needs—meaning, again, that ADSS did not offer them needed services with reasonable promptness. Jamison had hours taken away during the pandemic and then partially "returned" to him, leaving him in a position where he now receives a reduced quantity of services, not justified by any evaluation or assessment.

136.    These arbitrary barriers that Defendants erect to obtaining services prevent the provision of waiver services to eligible individuals with reasonable promptness, in violation of the requirements of the Medicaid Act and its implementing regulations.

## V.    CLASS ACTION ALLEGATIONS

### Plaintiff Class

137.    All Plaintiffs bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a class of all E&D Waiver recipients in the State of Alabama.

### Numerosity: Fed. R. Civ. P. 23(a)(1)

138.    The class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). There are over 12,000 individuals currently admitted to the E&D Waiver, and an unknown number of prospective recipients awaiting admission to services. Each individual is entirely dependent on Defendants for the provision of waiver services. Due to the policies and practices of Defendants, all E&D Waiver enrollees are currently having or are at risk of having their rights under the Medicaid Act and the Fourteenth Amendment to the United States Constitution violated.

139.    The Plaintiff Class members are identifiable using records maintained in the ordinary course of business by ADSS or Alabama Medicaid.

**Commonality: Fed. R. Civ. P. 23(a)(2)**

140.    There are questions of law and fact common to the members of the class. Such questions include, but are not limited to:

a.  Whether Defendants have a custom, policy, or practice of failing to provide E&D Waiver recipients with the due process protections mandated by the Medicaid Act when those recipients' services are reduced or terminated, or when their requests for services are denied;

b.  Whether Defendants have a custom, policy, or practice of failing to perform assessments of E&D Waiver recipients' service needs that comport with the basic requirements of the Medicaid Act;

c.  Whether Defendants have a custom, policy, or practice of failing to furnish E&D Waiver services to recipients with reasonable promptness; and

d.  Whether Defendants' custom, policy, or practice of failing to provide E&D Waiver recipients with appropriate due process protections when those recipients' services are

reduced or terminated, or when their requests for services are denied violates the Fourteenth Amendment.

141.    Defendants are expected to raise common defenses to these claims, including denying that Defendants' actions violated the law.

### Typicality: Fed. R. Civ. P. 23(a)(3)

142.    The claims of the named Plaintiffs are typical of those of the Plaintiff Class. The named Plaintiffs' claims arise from the same policies, practices, or courses of conduct as those of the Plaintiff Class. The named Plaintiffs' claims are based on the same theory of law as the class's claims.

### Adequacy: Fed. R. Civ. P. 23(a)(4)

143.    The named Plaintiffs are capable of fairly and adequately protecting the interests of the Plaintiff class. The named Plaintiffs do not have any interests antagonistic to the class. The named Plaintiffs, as well as the Plaintiff Class members, seek to enjoin the unlawful acts and omissions of Defendants. Finally, the named Plaintiffs are represented by counsel experienced in civil rights litigation, litigation on behalf of recipients of and applicants for Medicaid services, and complex class action litigation.

### Fed. R. Civ. P. 23(b)(1)(A) and (B)

144.    This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of current class members is over 12,000, and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants. Additionally, the prosecution of separate actions by individual class members could result in adjudications with respect to

individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

**Fed. R. Civ. P. 23(b)(2)**

145.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendant's policies, practices, actions, and omissions that form the basis of this complaint are common to and apply generally to all members of the class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the class.

## VI.    LEGAL CLAIMS

**COUNT I**
**Violation of the Medicaid Act, 42 U.S.C. § 1396a(a)(3)**
**(Deprivation of Notice and Right to Fair Hearing)**

146.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 145 above as if set forth fully herein.

147.    Plaintiffs are enrolled in the E&D Waiver program and are entitled to adequate notice and a fair hearing under 42 U.S.C. § 1396a(a)(3) and 42 U.S.C. § 1983 at any time that their waiver services are reduced or terminated, or when their requests for services are denied. Defendants, acting under the color of state law, have effectively denied Plaintiffs and the Plaintiff Class services under the E&D Waiver by (a) failing to authorize services that Plaintiffs have requested and (b) authorizing services but not providing the type or amount of services that Plaintiffs have requested. However, Defendants have failed to provide Plaintiffs and the Plaintiff Class with any of the due process protections that must, as a matter of law, accompany any denial of services.

148.    Defendants Azar and Brown are denying Plaintiffs and the Plaintiff Class procedural due process by not providing them with the notice and Fair Hearing required by 42 U.S.C. § 1396a(3) in violation of 42 U.S.C. § 1983.

## COUNT II
### Violation of the Medicaid Act, 42 U.S.C. § 1396n(c)
### (Failure to Provide Adequate Assessment Person-Centered Planning)

149.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 145 above as if set forth fully herein.

150.    Plaintiffs are enrolled in the E&D Waiver program and are entitled to an individualized, person-centered assessment for the appropriate administration of waiver services. *See generally* 42 C.F.R. § 441.365.

151.    Plaintiffs are further entitled to have their waiver services furnished under "a written person-centered service plan . . . that is based on a person-centered approach and is subject to approval by the Medicaid agency." 42 C.F.R. § 441.301(b)(1)(i). Person-centered plans must be developed through a process that, among other things, reflects the individual's preferences and goals in addressing their health and long-term services and support needs. *See generally* 42 C.F.R. § 441.301(c).

152.    Defendants, acting under the color of state law, have denied Plaintiffs and the Plaintiff Class their right to adequate assessment and person-centered planning as mandated by the Medicaid Act, in violation of 42 U.S.C. § 1396n(c) and 42 U.S.C. § 1983.

## COUNT III
### Violation of the Medicaid Act, 42 U.S.C. § 1396a(a)(8)
### Failure to Furnish Medicaid Services with Reasonable Promptness

153.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 145 above as if set forth fully herein.

154.    Defendants' operation and administration of the E&D Waiver is subject to the requirements of federal Medicaid law, including but not limited to, 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.930(a)-(b).

155.    Defendants are therefore obligated to provide medical assistance, including E&D Waiver services, to Plaintiffs and the Plaintiff Class with reasonable promptness.

156.    Defendants, acting under the color of state law, have denied Plaintiffs and the Plaintiff Class their right to reasonably prompt provision of medical assistance, in violation of 42 U.S.C. § 1396a(a)(8) and 42 U.S.C. § 1983.

**COUNT IV**
**Claim under 42 U.S.C. § 1983, Deprivation of Federal Constitutional Rights**
**(Denial of Procedural Due Process)**

157.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 145 above as if set forth fully herein.

158.    Plaintiffs are entitled under federal law to adequate notice and opportunity for a pre-termination or pre-reduction hearing on any termination or reduction in medical care and services, as well as adequate notice of and an opportunity to challenge any denial of a request for services. *See Goldberg v. Kelly*, 397 U.S. 254 (1970) (holding that due process requires that welfare beneficiaries be given effective notice and right to a hearing).

159.    Plaintiffs and the Plaintiff Class are enrolled in the E&D Waiver program and are eligible for—and have a legitimate, cognizable interest in receiving—the services available to them under that waiver. The services are necessary for the ability of Plaintiffs and the Plaintiff Class to live independently and be integrated in their community to the same degree as individuals who do not have disabilities. As such, they enjoy a constitutionally protected property interest in receiving the E&D Waiver services that they need.

160. Even though Plaintiffs and the Plaintiff class have experienced reductions, terminations, and denials of services, they have not been provided with proper notice of the adverse action, including the reasons for the adverse action and notification that the adverse action can be appealed under Alabama administrative procedures.

161. Without proper notice of the adverse action and an opportunity to challenge same, Plaintiffs and the Plaintiff Class have lost the opportunity to secure action by Defendants to rectify their lack of services and the injuries that flow therefrom.

162. Defendants would not be unduly burdened by providing Plaintiffs and the Plaintiff Class with timely, detailed, *legally sufficient* notice of the reasons that their services were reduced, terminated, or denied; the reasons for their ongoing lack of E&D Waiver services; and providing them an opportunity to contest the reduction, termination, denial, or ongoing lack of services through the State of Alabama's administrative hearing processes.

163. Defendants, acting under the color of state law, have violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court order the following relief and remedies:

a. DeC.R. that Defendants' policies and practices related to the administration of Alabama's E&D Waiver, as set forth in Paragraphs 1-145 above, violate the Medicaid Act, the United States Constitution, and 42 U.S.C. § 1983 by failing to provide E&D Waiver services to Plaintiffs and the Plaintiff Class with reasonable promptness.

b.  DeC.R. that Defendants' denial(s), reduction(s), or termination(s) of Plaintiffs' and the Plaintiff Class's E&D Waiver services without adequate notice or opportunity for a Fair Hearing constitutes a denial of:

i.  Plaintiffs' and Plaintiff Class members' constitutionally-protected right to due process of law guaranteed to them under the Fourteenth Amendment to the Constitution of the United States; and

ii.  Plaintiffs' and Plaintiff Class members' right to due process of law under the Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. § 1396a et seq., and 42 U.S.C. § 1983.

c.  Permanently enjoin Defendants from failing to provide E&D Waiver recipients with appropriate assessments of their needs and related person-centered planning;

d.  Permanently enjoin Defendants from failing to provide, with reasonable promptness, E&D Waiver recipients with services in the amount and with the frequency that they require to live safely in the community;

e.  Permanently enjoin Defendants from failing to provide E&D Waiver recipients with notice of decisions to deny, reduce, and/or terminate their E&D Waiver services (actual or requested), and notice of their right to challenge any such denial, reduction, and/or termination in a Fair Hearing conducted in accordance with Alabama's administrative rules and the requirements of the Medicaid Act and its implementing regulations, and the United States Constitution;

f.  Retain jurisdiction over this matter until such time as the Court is satisfied that Defendant's unlawful policies, practices, and acts complained of herein cannot recur;

g.  Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 42 U.S.C.

§§ 1988, 12133, and 12205, and any other applicable law or regulation; and

h.  Grant such other and further relief as this Court deems to be just and equitable.

Dated: February 12, 2024                      Respectfully submitted,

<u>/s/Shandra N. Monterastelli</u>
Shandra N. Monterastelli (ASB-1016-N00Q)
J. Carlton Sims (ASB-2020-S77S)
Alabama Disabilities Advocacy Program
2008 12th Street
Box 870395
Tuscaloosa, Alabama 35487-0395
(205) 348-4928 – T
(205) 348-3909 – F
smonterastelli@adap.ua.edu
csims@adap.ua.edu

**DEFENDANTS TO BE SERVED VIA CERTIFIED MAIL**